UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                         )
In re:                   )
                         )
NICKELS MIDWAY PIER, LLC )         HONORABLE JOSEPH E. IRENAS
                         )              CIVIL ACTION
          Debtor.        )            NO. 05-5514 (JEI)
                         )        BANKRUPTCY NO. 03-49462(GMB)
                         )
NICKELS MIDWAY PIER, LLC )
                         )              OPINION
Appellant / Cross-appellee, )
                         )
     v.                  )
                         )
WILD WAVES, LLC          )
                         )
Appellee / Cross-appellant. )
                         )
```

**Appearances:**

TEICH GROH
By: Brian W. Hofmeister, Esq.
Michael A. Zindler, Esq.
691 State Highway 33
Trenton, New Jersey 08619
     Counsel for Nickels Midway Pier, LLC

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY
By: Fredric R. Cohen, Esq.
Fairway Corporate Center
4300 Haddonfield Road
Pennsauken, New Jersey 08109
     Counsel for Nickels Midway Pier, LLC

COZEN O'CONNOR
By: Arthur J. Abramowitz, Esq.
Jerrold N. Poslusny, Jr., Esq.
Liberty View, Suite 300
457 Haddonfield Road
Cherry Hill, New Jersey 08002
     Counsel for Wild Waves, LLC

**IRENAS**, Senior District Judge:

This matter comes before the Court on the appeal of Debtor Nickels Midway Pier, LLC ("Nickels") and cross-appeal of Wild Waves, LLC ("Wild Waves"), from the Bankruptcy Court's order of September 14, 2005, authorizing Nickels to reject an executory contract with Wild Waves, pursuant to 11 U.S.C. § 365(a), and holding that Wild Waves is entitled to the protections set forth in § 365(i).

**I.**

Nickels is a real estate purchasing, leasing and management company.  Nickels owns a pier located at 3500 Boardwalk, Wildwood, New Jersey ("Pier"), which it purchased in 1976.  In or about the early spring of 1999, Nickels entered into a written lease agreement ("Lease") with Wild Waves, in which Wild Waves would lease 70% of the Pier ("leased premises") for the purpose of constructing and operating a water park.[1]  (*See* Lease; Nickels Appendix:[2] 19-30)

The Lease specifies a term of approximately sixteen years, beginning on May 15, 1999, and terminating on December 31, 2014.

---

[1]The Lease is dated May 15, 1999, but apparently was signed on March 29, 1999, in order to avoid triggering an obligation to pay a commission to a real estate broker.

[2]Hereinafter the Court will refer to the Appendix submitted by Nickels as "NA" and the Appendix of Wild Waves as "WWA."

2

(Lease at ¶ 3; NA:20)  The Lease also provides that Wild Waves may extend the Lease for three additional five-year terms. (Lease at ¶ 34; NA:27) Nickels was required to give possession of the leased premises to Wild Waves on October 1, 1999, although Wild Waves was permitted limited access to the leased premises before that date.  (Lease at ¶¶ 7, 10; NA:21-22)  Wild Waves was obligated to make five rental payments of $50,000 each year, beginning on January 1, 2000, with an increase in rent effective January 1, 2003.  (Lease at ¶ 4; NA:20)  Wild Waves was also required to pay annually to Nickels one-third of the real estate taxes for the entire Pier.  (Lease at ¶ 9; NA:21)

The Lease includes a provision in which Nickels acknowledges that Wild Waves will be seeking financing to construct a water park on the Pier and permits a lien to be placed on the Pier by Wild Waves' financing institution.  (Lease at ¶ 20(c); NA:25) The provision specifies that Nickels is not obligated to assume personal responsibility for the payment of the lien or to subordinate any existing mortgage to the lien of Wild Waves' financing institution.  (Id.)

The Lease does not mention any agreement between the parties that Nickels would sell the entire Pier to Wild Waves.  Wild Waves asserts, however, that it also had an oral agreement with Nickels to buy the Pier in 2003.  A written document entitled Agreement for the Sale of Real Estate (hereinafter "Agreement for

Sale") was prepared but was not executed, as it was not signed by a representative of Nickels.  (Agreement for Sale; NA:48-62)  Nickels maintained that it never agreed to sell the Pier to Wild Waves.  Wild Waves never furnished any payment called for by the Agreement for Sale and Nickels never delivered the deed.

On September 29, 1999, the parties agreed to several amendments to the Lease which were memorialized in a written and executed document entitled Amendment to Lease.  (NA:488-89)  The amendments include a provision obligating Wild Waves to pay $400,000 as additional collateral in consideration of Nickels permitting Wild Waves to encumber the Pier in order to obtain financing for the water park.  (Id.)  Nickels was obligated to hold the money as collateral until Wild Waves' mortgage from Sun Bank matured in or about 2004, but could use the money in the interim to cure any defaults by Wild Waves on the Sun Bank mortgage.  (Id.)  The Amendment to Lease does not mention any agreement to sell the Pier.

In 2001, Nickels instituted a civil action against Wild Waves in New Jersey Superior Court, Chancery Division ("State Court Action").[3]  Wild Waves filed a counterclaim in the State Court Action seeking a determination that an oral contract for sale of the Pier existed between the parties.

---

[3]The subject matter of the suit is not entirely clear from the record, but it appears that Nickels was seeking possession of the leased premises for non-payment of rent.

Before the State Court Action could be resolved, Nickels filed for chapter 11 bankruptcy on December 8, 2003. On December 16, 2003, Nickels filed a motion to reject the Lease, pursuant to 11 U.S.C. § 365 ("Motion to Reject"). Wild Waves filed a motion for stay relief to pursue its counterclaim in the State Court Action, which the Bankruptcy Court granted on February 20, 2004. The Bankruptcy Court also reserved its decision on the Motion to Reject until the resolution of the State Court Action.

In a letter opinion dated April 12, 2005, Presiding Judge George Seltzer of the Superior Court, Chancery Division, held that an oral contract for sale of the Pier existed between Nickels and Wild Waves. *Nickels Midway Pier v. Wild Waves*, No. CPM-53-01 (N.J. Super. Ct. Ch. Div. Apr. 12, 2005)(hereinafter "Letter Op.") Judge Seltzer held that the contract for sale required Nickels to sell and Wild Waves to buy the Pier for a price of $5.5 million in 2003. (Letter Op. at 1) Wild Waves was to pay $3.490 million[4] in cash with Nickels taking back a $2 million mortgage. (Letter Op. at 14)

He determined that the agreement to sell was reached in May, 1999, and the final terms of the sale were contained in the

---

[4]The unexecuted Agreement for Sale also provided that Wild Waves would remit a $10,000 deposit upon execution of the Agreement for Sale. (Agreement for Sale at ¶ 3(a); NA:49) Wild Waves indicated during oral argument that it did not think it was obligated to make this payment because the Agreement for Sale was never executed, and thus did not remit the deposit.

unexecuted Agreement for Sale, which was sent from Nickels'
counsel to Wild Waves on May 17, 1999.  (Letter Op. at 2)  The
unexecuted Agreement for Sale provided that the sale was
contingent upon Wild Waves receiving a written commitment from an
institutional lender to make a mortgage loan in the amount of
$5.4 million[5] on or before three months of the date of the
closing.[6]  (Agreement for Sale at ¶ 4; NA:50-51)  The date of the
closing was set for January 31, 2003.  (Id. at ¶ 5; NA:51)

     After reviewing other contemporaneous communications between
Nickels and Wild Waves, Judge Seltzer concluded:

> I am, therefore, satisfied, beyond any hesitation, that
> Nickels Midway Pier and Wild Waves had reached an
> agreement that would require Wild Waves to lease a
> portion of the Pier for a three year period and
> thereafter purchase it in accordance with the terms of
> [Agreement for Sale].  I am further certain that the
> lease and sale were two aspects of a thoroughly
> integrated agreement.  Although only the portion of
> agreement [sic] respecting the lease was committed to
> an executed writing, I remain absolutely convinced that
> these parties intended to be bound as to the sale, even
> in the absence of an executed writing.

(Letter Op. at 9-10)  He determined that the Lease was one
component of a transaction that was to culminate in the sale of

---

[5]The Agreement for Sale further specifies that the "mortgage
shall include sufficient funds for the payment of the existing
indebtedness Borrower has incurred for the building of the water
park contemplated in the Business Lease between the parties
hereto dated May 15, 1999."  (Agreement for Sale at ¶ 4; NA:50)

[6]If Wild Waves was unable to secure the mortgage loan
commitment within that time, both Nickels and Wild Waves had the
right to cancel the Agreement for Sale upon written notice.
(Agreement for Sale at ¶ 4; NA:51)

the Pier, and was entered into in part to aid Wild Waves in securing financing for the water park.  (Letter Op. at 11)

After resolution of Wild Waves' counterclaim in the State Court Action, Nickels sought to proceed with its Motion to Reject in Bankruptcy Court.  Although it is not entirely clear from the record on appeal, it appears that upon an oral motion by Nickels, the Bankruptcy Court and the parties treated the renewed Motion to Reject as encompassing both the written Lease and the oral contract for sale (collectively the "Agreement"), pursuant to Judge Seltzer's ruling.  (*See* Tr. Of Aug. 9, 2005, Hearing at 7:11-18; NA:72)

The Bankruptcy Court held a hearing on the Motion to Reject on August 9, 2005, and issued its opinion on September 1, 2005, and an order on September 14, 2005.  Bankruptcy Judge Burns first held that the Agreement was an executory contract for the purposes of 11 U.S.C. § 365(a).  She concluded that the Agreement had not been terminated prior to the filing of the bankruptcy petition by any anticipatory repudiation on the part of Nickels, and that Wild Waves was estopped from arguing otherwise. Bankruptcy Judge Burns noted that substantial performance under the Agreement was still outstanding by both parties.

The Bankruptcy Court next held that Nickels was permitted to reject the Agreement pursuant to § 365(a).  Bankruptcy Judge Burns concluded that Nickels exercised reasonable business

7

judgment in rejecting the Agreement, as real estate values in Wildwood had increased and Nickels had multiple offers to buy the Pier at much higher prices than in the Agreement.  The Bankruptcy Court rejected Wild Waves' argument that Nickels could not reject the Agreement because Wild Waves was entitled to specific performance of the Agreement under state law.  Bankruptcy Judge Burns determined that the protections granted in § 365(i) to parties whose contracts for sale of real property have been rejected by a debtor preempted Wild Waves' specific performance claim.  The Bankruptcy Court also held that Wild Waves' cause of action for specific performance of the Agreement was a claim in bankruptcy under 11 U.S.C. § 101(5) and thus could be discharged in a bankruptcy proceeding.

Finally, the Bankruptcy Court concluded that Wild Waves was entitled to the protections of § 365(i) because it was a "purchaser in possession" within the meaning of that section even though it was only in possession of 70% of the Pier.  Nickels appeals the Bankruptcy Court's determination and Wild Waves cross-appeals.

## II.

The District Court has jurisdiction to hear appeals from final judgments, orders and decrees of the Bankruptcy Court in cases and proceedings referred pursuant to 28 U.S.C. § 157(a) to

the Bankruptcy Court.  28 U.S.C. § 158(a).  The Bankruptcy Court
exercised jurisdiction over this case pursuant to § 157(a) and
thus, under § 158(a), this Court has jurisdiction over the
appeals of the parties from the final order of the Bankruptcy
Court.

The District Court reviews de novo the legal determinations
of the Bankruptcy Court.  *In re Fairfield Exec. Assoc.*, 161 B.R.
595, 599 (Bankr. D.N.J. 1993).  The factual determinations of the
Bankruptcy Court will be left undisturbed on appeal unless they
are clearly erroneous.  Fed. R. Bankr. P. 8013.

**III.**

A.

The Bankruptcy Code provides that a trustee or debtor in
possession "subject to the court's approval, may assume or reject
any executory contract or unexpired lease of the debtor."[7]
§ 365(a).  "'[An executory contract is] a contract under which
the obligation of both the bankrupt and the other party to the
contract are so far unperformed that the failure of either to
complete performance would constitute a material breach excusing
performance of the other.'"  *Sharon Steel Corp. v. National Fuel*

---

[7]The Bankruptcy Code includes several exceptions to the
power of a trustee or debtor in possession to reject or assume a
contract under § 365(a).  *See, e.g.,* § 365(b)-(d).  The parties
do not assert that any of these exceptions are applicable here.

*Gas Dist. Corp. (In re Sharon Steel)*, 872 F.2d 36, 39 (3d Cir. 1989)(quoting Vern Countryman, *Executory Contracts in Bankruptcy, Part I*, 57 Minn. L. Rev. 439, 460 (1973)).

Although the Bankruptcy Code does not specify the standard to be applied in assessing the decision of a trustee or debtor in possession to assume or reject of a contract, the Third Circuit has adopted the business judgment standard. *Sharon Steel*, 872 F.2d at 39-40; *see also In re Central Jersey Airport Svcs.*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002). "To satisfy the test, the trustee or debtor in possession needs to establish that rejection will benefit the estate. . . . Once the debtor meets its burden, the non debtor party bears the burden of proving that the debtor's decision derives from bad faith, whim or caprice." *In re Central Jersey Airport Svcs.*, 282 B.R. at 183 (citations omitted).

If a bankruptcy court approves the rejection of an executory contract or unexpired lease pursuant to § 365(a), the Bankruptcy Code provides certain protections to the other party to the contract or lease. In particular, § 365(h) and § 365(i) provide some protection, respectively, to lessees and purchasers in possession of real property under a contract for sale.

Section 365(h) provides, in relevant part, that if the debtor in possession rejects an unexpired lease of real property under which the debtor is the lessor and the term of the lease

10

has begun, the lessee retains its rights in or appurtenant to the property for the term of the lease and any renewal or extension period.  § 365(h)(1)(A)(ii).  If the lessee remains in possession of the property under this provision, it is entitled to an offset against the rent for damages caused by the non-performance by the debtor of any obligations under the lease.  § 365(h)(1)(B).

Section 365(i) carves out a limited exception to a debtor's ability to reject a contract for the sale of real property.  It creates certain protections for a purchaser already in possession of the real property whose contract for sale has been rejected by the debtor.  The section provides that:

> (1)  If the trustee rejects an executory contract of the debtor for the sale of real property or for the sale of a timeshare interest under a timeshare plan, *under which the purchaser is in possession*, such purchaser may treat such contract as terminated, or, in the alternative, may remain in possession of such real property or timeshare interest.
> (2) If such purchaser remains in possession–
> (A) *such purchaser shall continue to make all payments due under such contract*, but may offset against such payments any damages occurring after the date of the rejection of such contract caused by the nonperformance of any obligation of the debtor after such date, but such purchaser does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset; and
> (B) the trustee shall deliver title to such purchaser in accordance with the provisions of such contract, but is relieved of all other obligations to perform under such contract.

§ 365(i) (emphasis added).  In the instant case, the Bankruptcy Court held that this section applied.

Nickels argues that the Bankruptcy Court erred in concluding

11

that Wild Waves was a "purchaser in possession" for the purposes
of § 365(i) because Wild Waves was not in possession of the
entire Pier.  Nickels also contends that Wild Waves' partial
possession of the Pier is pursuant to the Lease and not the oral
contract for sale.[8]  Nickels further maintains that Wild Waves
does not come within the ambit of § 365(i) because the statute is
intended to protect only those purchasers who have already made
payments under the contract of sale.

     In its cross-appeal, Wild Waves argues that the Bankruptcy
Court erred in determining that the Agreement was an executory
contract for the purposes of § 365(a).  Wild Waves contends that
Bankruptcy Judge Burns incorrectly held that it was judicially
estopped from arguing that the Agreement was terminated by
Nickels' anticipatory repudiation prior to the filing of the
bankruptcy petition, and further that she erred in concluding
that the Agreement had not been so terminated.  Wild Waves also
maintains that Nickels did not exercise reasonable business
judgment in rejecting the agreement pursuant to § 365(a).
Finally, Wild Waves contests Judge Burns' conclusion that it was

---

     [8]Wild Waves' contention that Nickels did not present this
argument to the Bankruptcy Court, and thus has waived it on
appeal, is without merit.  Nickels' brief in support of the
Motion to Reject argues that "Wild Waves [sic] possession of a
portion of the Property is pursuant to the terms of a Lease and
is not based upon the oral contract for sale. . . . Wild Waves
cannot transform its partial inhabitance of the Property under a
separate lease agreement into what amounts to 'possession' under
Code Section 365(i) and (j)."  (WWA:341-42)

barred from seeking specific performance of the Agreement under New Jersey law, arguing that: (a) § 365(i) does not preempt its state law specific performance cause of action, and (b) Wild Waves' specific performance cause of action is not a "claim" that can be discharged in a bankruptcy proceeding.

B.

In the opinion and the briefs on appeal, the parties and the Bankruptcy Court have treated the Lease and oral contract for sale as one seamless agreement, referring throughout to the Agreement.  This treatment, however, overlooks that the Lease and the oral contract for sale are independent components of the parties' integrated agreement as to the disposition of the Pier. As a result of this initial misstep, the Bankruptcy Court incorrectly held that Wild Waves is entitled to the protections of § 365(i).

1.

Judge Seltzer's ruling that the parties entered into an integrated agreement encompassing both the Lease and the oral contract for sale does not preclude the conclusion that the two aspects of the agreement operate independently.[9]  In fact, Judge

---

[9]Judge Seltzer did not refer to the contract as "integrated" in the traditional legal sense, that is, he clearly did not hold that the parties' entire agreement was found within the four

Seltzer recognized that the Lease and the oral contract for sale were distinct and separate steps in effecting the parties' agreement as to the ownership of the Pier.  He found that the parties agreed that Wild Waves would first lease a portion of the Pier in order to secure financing and build a water park pursuant to the terms of the Lease, and then Nickels would sell Wild Waves the entire Pier pursuant to the terms contained in the unexecuted Agreement for Sale.

It is a common occurrence that a business transaction is implemented through multiple contracts.  *See, e.g., In re T & H Diner, Inc.*, 108 B.R. 448, 450 (Bankr. D.N.J. 1989)(debtor and creditor "executed several interrelated contracts under which the debtor sublet the property and purchased a restaurant operating on the premises").  For example, when several individuals come together to form a corporation, their relationship will be memorialized in several separate contracts, such as the articles of incorporation, shareholder agreements, and employment/consulting contracts.  Here, Wild Waves and Nickels also chose to implement their overall agreement as to the disposition of the Pier through two separate, though interrelated, contracts.

The terms and operation of the two parts of the agreement

---

corners of a written document.  Rather, he described the agreement as integrated to emphasize the interrelation of its component parts.

14

between Nickels and Wild Waves illustrate their independent nature.  First, regardless of whether the sale of the Pier was ever completed, the Lease gives Wild Waves a sixteen-year leasehold interest in the leased premises, with the option to renew the Lease for three five-year terms.

The effectiveness of the Lease was expressly made contingent upon Wild Waves' ability to secure the necessary financing and government approvals for the construction of the water park, and not on Wild Waves' ability to secure financing to purchase the entire Pier.  The Lease also anticipates that Wild Waves may not be able to purchase the Pier, as it grants Nickels access to the leased premises for several purposes including showing the property to prospective buyers.

The oral contract for sale was made expressly contingent on Wild Waves' receipt of a written mortgage loan commitment in the amount of $5.4 million.  If the parties failed to close the sale, due to Wild Waves' inability to secure such a loan commitment or any other reason, the Lease would not be terminated or otherwise impacted by the failure to close.  *Cf. In re T & H Diner*, 108 B.R. at 450 (lease agreement provided that debtor's default on any promissory notes given by the debtor to the landlord in connection with purchase of restaurant on leased premises would be considered default under the lease).  There is no indication anywhere in the Lease or the unexecuted Agreement for Sale that

15

the failure to close would affect the Lease's sixteen-year term or the option to extend the Lease for three additional five-year terms.[10]

Additionally, the oral contract for sale was not contingent on Wild Waves' compliance with the terms of the Lease.  Normally, if a lease contains an option to buy the leased property, it will also provide that a breach of the lease would terminate the option to buy.  Here, however, the only contingency for the sale is the receipt of the mortgage loan commitment.

The oral contract for sale does not provide that payments made pursuant to the Lease would be counted towards the purchase of the Pier, or vice versa.  When the parties executed the Amendment to Lease to require Wild Waves to pay $400,000 as additional collateral, they specifically provided that if Wild Waves' mortgage was paid off before the maturity date the $400,000 or balance remaining would be used for rental payments as they become due, rather than crediting the amount towards the sums due under the oral contract for sale.  (NA:488-89)

Furthermore, the two aspects of the parties' agreement would be considered divisible under New Jersey law.  Whether a contract is entire or divisible "depends on the intentions of the parties, to be ascertained from the circumstances surrounding the

---

[10]The Court notes that if the parties closed the sale of the Pier, Wild Waves' leasehold interest would merge into its fee interest in the property and disappear.

16

agreement and the contract itself." *Studzinski v. Travelers Ins. Co.*, 108 N.J. Super. 416, 419 (Law Div. 1981); *see also Dixon v. Smyth Sales Corp.*, 110 N.J.L. 459, 460-61 (E. & A. 1931).

"If there be a single assent to a whole transaction involving several things or several kinds of property, a contract is always entire; but, if there be a separate assent to each of the several things involved, it is divisible. . . . A contract is 'entire' when the promise of one party is conditional on entire performance of the contract by the other party, and 'severable' when the part to be performed by one party consists of several distinct and separate items respecting which the consideration is apportioned to each item, or is left to be implied in law." *Dixon*, 110 N.J.L. at 461.

Here, the parties entered into the Lease and the oral contract for sale on separate occasions and by different methods (executed contract and oral agreement acknowledged in subsequent writing).  The Lease and the unexecuted Agreement for Sale require separate consideration from the parties for each aspect of the agreement.  The obligations of the parties under the oral contract for sale are not conditioned on the faithful performance of the other party's obligations under the Lease.  The promises of each party under the Lease and oral contract for sale are thus "distinct and separate items respecting which the consideration

17

is apportioned to each item," to which separate assent was given. *Id.*; *cf. In re T & H Diner*, 108 B.R. at 454 (transaction not divisible when parties simultaneously executed the lease and purchase agreement and lease provided that any default on promissory note issued in connection with purchase of restaurant was also a default under the lease).


## 2.

The Bankruptcy Court's conflation of the Lease and the oral contract for sale is significant because, as a result, it incorrectly equated Wild Waves' possession of the leased premises under the Lease with possession under the oral contract for sale. The parties have focused on whether § 365(i) requires that Wild Waves be in possession of the entire Pier or if possession of 70% of the Pier is sufficient to bring Wild Waves under the protection of § 365(i) as a "purchaser in possession."[11] The crucial inquiry, however, is not whether Wild Waves has possession of a sufficient portion of the Pier but whether it came into possession in circumstances which trigger the protection of "purchasers in possession" under § 365(i).

Viewing the Lease and the oral contract for sale as separate aspects of the agreement, it is clear that Wild Waves is in

---

[11]The Court notes that in the appropriate case, the issue of whether partial occupancy is sufficient to trigger § 365(i) could be determinative.

18

possession of the leased premises under the Lease and not the oral contract for sale.  Section 365(i) is thus inapplicable because there is no contract for sale "under which [Wild Waves] is in possession" of any part of the Pier.  § 365(i)(1).

The legislative history of Section 365(i) is scant, but its limited discussion of the provision reveals a concern for "obviating the hardship involved in forcing a purchaser already in possession to leave."  *McCannon v. Marston*, 679 F.2d 13, 18 (3d Cir. 1982).  The Legislative History and Comment states that:

> Subsection (i) gives a purchaser of real property under a land installment sales contract similar protection [as § 365(h) provides to lessees].  The purchaser, if the contract is rejected, may remain in possession or may treat the contract as terminated.  If the purchaser remains in possession, he is required to continue to make the payments due, but may offset damages that occur after rejection.  The trustee is required to deliver title, but is relieved of all other obligations to perform.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 349 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 60 (1978).

Although the Third Circuit and other courts have held that the application of § 365(i) is not limited to land installment sale contracts, *see McCannon*, 679 F.2d at 18, the origins of the Bankruptcy Code's protection of purchasers in protection is linked to this particular form of land sale contract.  "'The purchaser in this kind of contract is likely to be the buyer of a home or farm or small business who has adjusted to a new location.  Very often, especially in the case of a residential

buyer, he will be poor.  Certainly, modern American bankruptcy policy places as high a value on relieving the poor from the consequences of their own and others' improvidence as in doing perfect justice between creditors.'" *In re Summit Land*, 13 B.R. 310, 317 (Bankr. D. Utah 1981)(citing working paper included in the 1973 Report of the Commission on the Bankruptcy Laws of the United States); *see also In re Balco Equities Ltd., Inc.*, 323 B.R. 85, 97 (Bankr. S.D.N.Y. 2005).

As the Bankruptcy Court noted in *In re Maier*, however, "[t]o limit the type of contract to which § 365(i) applies is to ignore the statutory scheme set up by Congress to protect those who deal with a debtor when the debtor is the owner of real property." 127 B.R. 325, 327 (Bankr. W.D.N.Y. 1991)(holding that purchasers in possession under contracts other than land installment sale contracts are protected by § 365(i)); *see also McCannon*, 679 F.2d at 18 ("It is understandable that a committee note would single out such contracts for mention, since they are common instances in which the purchaser would come into possession before the contract is fully executed.").

It appears that § 365(i) would encompass a land sale contract such as the oral contract of sale between Wild Waves and Nickels, provided the other requirements of the section were met. Despite their broad interpretation of the types of contracts for sale included within the scope of § 365(i), courts have never

suggested that the provision encompasses those purchasers who are in possession under an agreement other than the land sale contract.  *See McCannon*, 679 F.2d at 17 ("Section 365(i) permits a purchaser who is in possession *under such an executory contract* that has been rejected by the trustee the choice of treating the contract as terminated or remaining in possession.")(emphasis added); *In re Summit Land*, 13 B.R. at 317 ("The statutes speak of a purchaser in possession and of a party 'whose executory contract to purchase real property from the debtor is rejected and *under which such party is not in possession*.'")(emphasis added).

This case presents the rare situation in which a party in possession of real property under a lease also has a separate (albeit related) contract for sale of the property.[12]  Although Wild Waves is a contract purchaser of the Pier and is in possession of at least part of the Pier, § 365(i) is not applicable because its possession is not pursuant to the contract of sale.

---

[12] *In re Maier* presents a more typical case in which a creditor gains possession under the same contract giving him the right to purchase the property.  There, the creditor leased a farm from the debtor, and his lease included in its terms an option to buy the property.  127 B.R. at 326.  Upon exercise of the option, it appeared that the lease would terminate and become a contract for the purchase of real estate.  The Bankruptcy Court concluded that if the creditor properly exercised his option to purchase the farm prior to bankruptcy, the creditor would become a purchaser in possession under New York law and thus would be entitled to the protections of § 365(i).  *Id.* at 327-28.

The Lease provides that Nickels must transfer possession of the leased premises to Wild Waves on October 1, 1999.  It appears from the record that Nickels in fact transferred possession to Wild Waves on or about that date, pursuant to the Lease.

By contrast, the unexecuted Agreement for Sale makes no reference to Wild Waves taking possession or Nickels transferring possession of any portion of the Pier.  Contracts for sale ordinarily include a clause outlining the transfer of possession, and it is notable that the unexecuted Agreement for Sale does not contain any such provision.  Moreover, the only specific statement in the written document with regard to possession of the Pier is found in Paragraph 11(a), which provides only that Wild Waves shall have access to the premises in order to conduct inspections.  (Agreement for Sale at ¶ 11(a); NA:53)

The terms contained in the unexecuted Agreement for Sale also acknowledge that Wild Waves already possessed part of the Pier, through the references to Wild Waves building and operating the water park on the leased premises.  (*See* Agreement for Sale at ¶¶ 4, 9; NA:50,52)  The oral contract for sale clearly anticipates that Wild Waves would already be in possession of the leased premises pursuant to the Lease.[13]

---

[13]In their briefs and before this Court, the parties discussed the applicability of the requirement contained in § 365(i)(2)(A) that the purchaser in possession "shall continue to make" payments due under the contract for sale, in light of Wild Waves' failure to make the $10,000 initial payment called for in

C.

This Court affirms the Bankruptcy Court's determination that Wild Waves' claim for specific performance of the oral contract for sale is a claim within the meaning of 11 U.S.C. § 101(5), and thus can be discharged in a bankruptcy proceeding.  Section 101(5) defines a claim as, inter alia, a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment. . . ."  § 101(5)(B).  The term "claim" should to be construed broadly.  *See Ohio v. Kovacs*, 469 U.S. 274, 279 (1985); *Air Line Pilots Ass'n v. Continental Airlines (In re Continental Airlines)*, 125 F.3d 120, 132 (3d Cir. 1997).

In determining the scope of § 101(5)(B), the Supreme Court in *Kovacs* relied upon a statement by the sponsors of the Bankruptcy Reform Act:

> Section [101(5)(B)] . . . is intended to cause the liquidation or estimation of contingent rights of payment for which there may be an alternative equitable remedy with the result that the equitable remedy will be susceptible to being discharged in bankruptcy.  For example, in some States, a judgment for specific performance may be satisfied by an alternative right to payment in the event performance is refused; in that event, the creditor entitled to specific performance would have a 'claim' for purposes of a proceedings under title 11.

469 U.S. at 280 (quoting 124 Cong. Rec. 32393 (1978)).

---

the unexecuted Agreement for Sale.  Given our holding that Wild Waves' may not claim the protection of § 365(i) because it is not a purchaser in possession for the purposes of the statute, we need not address the parties' arguments with regard to the "shall continue" requirement.

23

Relying on this citation in *Kovacs,* the Third Circuit has held that "an equitable remedy will 'give rise to a right of payment,' and therefore be deemed a 'claim,' when the payment of monetary damages is an alternative to the equitable remedy." *In re Ben Franklin Hotel Assocs.*, 186 F.3d 301, 305 (3d Cir. 1999); *see also In re Kilpatrick*, 160 B.R. 560, 564 (Bankr. E.D. Mich. 1993)("any right which can be reduced to monetary damages is a 'claim,' even if that right could also be enforced by means of an 'equitable remedy'")(creditor's rights under covenant not to compete held to be a claim).[14]

As the Bankruptcy Court observed, under New Jersey law specific performance is an equitable remedy that is appropriate when the legal remedy of compensation is inadequate or incalculable. *Fleischer v. James Drug Stores*, 1 N.J. 138, 146-47 (1948). "There is a virtual presumption, because of the uniqueness of land and the consequent inadequacy of monetary

---

[14]Courts have varied in the standard they apply to determine whether monetary damages are an alternative to equitable relief. *See In re Ben Franklin Hotel Assocs.*, 186 F.3d at 306 (stating the relevant inquiry is whether monetary damages are a "viable alternative"); *Sheerin v. Davis (In re Davis)*, 3 F.3d 113, 116 (5th Cir. 1993)("suboptimal" monetary damages are not an alternative); *In re Kilpatrick*, 160 B.R. at 566 (creditor must demonstrate that specific performance is its only viable remedy); *In re Indian River Estates, Inc.*, 293 B.R. 429, 434 (Bankr. N.D. Ohio 2003)(creditor not required to accept monetary remedy if it would be "clearly not in proportion to the equitable remedy"). The text of § 101(5), as well as the legislative history, however, do not incorporate any notion of the adequacy of the alternative monetary remedy.

damages, that specific performance is the buyer's appropriate remedy for the vendor's breach of the contract to convey." *Friendship Manor, Inc., v. Greiman*, 244 N.J. Super. 104, 113 (App. Div. 1990)(stating that specific performance is a discretionary remedy and a party seeking such remedy "must stand in conscientious relation to his adversary").

A buyer may also seek compensatory or "benefit of the bargain" damages, however, when a seller breaches an executory contract to convey real property.[15] *Donovan v. Bachstadt*, 91 N.J. 434, 443-444 (1982)(rejecting the English rule which limited buyer's damages to recovery of deposit unless seller wilfully refuses to convey or has committed fraud or deceit). While noting that the elements of damages will depend on the circumstances of the particular case, the *Donovan* Court stated:

> [S]ome items, however, will almost invariably exist.
> Thus the purchaser will usually be entitled to the
> return of the amount paid on the purchase price with
> interest thereon. Costs and expenses incurred in
> connection with the proposed acquisition, such as for
> the title search and survey, would fall in the same
> category. The traditional test is the difference
> between the market price of the property at the time of
> the breach and the contract price.

*Id.* at 445. *Donovan* further noted that "[d]amages for breach of contract are appropriate where there has been a failure to comply

---

[15]The Court notes that Wild Waves provided a detailed and specific calculation of the damages it would incur if the parties' agreement was rejected in its brief before the Bankruptcy Court. (WWA:255-58)

with a decree for specific performance." *Id.* at 437 n.1.

Nickels' alleged breach of the oral contract of sale "gives rise to a right to payment," § 101(5)(B), and thus, "the payment of monetary damages is an alternative to the equitable remedy." *In re Ben Franklin Hotel Assocs.*, 186 F.3d at 305.  As such, Wild Waves' action for breach of the oral contract for sale is a claim that can be discharged in bankruptcy.  *See TKO Properties, LLC, v. Young (In re Young)*, 214 B.R. 905, 912 (Bankr. D. Id. 1997)(finding that both specific performance and monetary damages were available under Idaho law for breach of contract for sale of real property and thus purchaser had claim within meaning of § 101(5)); *A.J. Lane & Co., Inc., v. BSC Group (In re A.J. Lane & Co., Inc.)*, 115 B.R. 738, 742 (Bankr. D. Mass. 1990)("A seller's obligation under a contract for the sale of real estate is consequently treated as a claim in bankruptcy where the buyer has the right to either damages or specific performance, so that the seller's obligation is allowable and dischargeable.").

The Court notes that if it were to accept Wild Waves' argument that the availability of a specific performance remedy takes an action outside the definition of a claim dischargeable in bankruptcy, it would render the rejection provisions of § 365 meaningless with regard to many contracts.  The fact that a creditor's specific performance remedy is preferable to a damages remedy does not mean that a creditor's right to specific

26

performance cannot be reduced to a claim in bankruptcy.  *See A.J. Lane*, 115 B.R. at 743 ("Congress was obviously intent that the remedy of specific performance not give the buyer more favorable treatment than he would obtain through his claim for damages.").


                                    D.

     In light of the ruling that the Lease and the oral contract of sale must be analyzed separately in determining the applicability of § 365, on remand the Bankruptcy Court must separately analyze the legal consequences of the rejection of each aspect of the parties' agreement, including the impact, if any, of Wild Waves' arrearages under the Lease.  *See Stewart Title Guaranty Co. v. Old Republic National Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996)("If a single contract contains separate, severable agreements the debtor may reject one agreement and not another."); *In re Cutters, Inc.*, 104 B.R. 886, 889 (Bankr. M.D. Tenn. 1989).[16]

_____

     [16]Wild Waves argues that Nickels anticipatorily breached the oral contract for sale, and thus the contract was no longer executory and could not be rejected pursuant to § 365.  Neither party has performed any of their obligations under the oral contract for sale, and so the contract is clearly executory.  *See Sharon Steel*, 872 F.2d at 39.  Wild Waves incorrectly equates the anticipatory repudiation of a contract with termination or cancellation of a contract.  Anticipatory repudiation is a statement in advance of the time for performance that a party will breach its obligation to perform under a contract.  23 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 63:28 (4th ed. 1994)("Otherwise stated, an anticipatory repudiation is a breach of contract.").  A pre-

The Bankruptcy Court must also reconsider its ruling that rejection is in the best interests of the debtor's estate, and analyze separately whether rejection of the Lease or the oral contract for sale meets the standard of the business judgment rule. *See In re Central Jersey Airport Svcs.,* 282 B.R. at 183. The Court notes that if Nickels decides to or is permitted to reject the Lease, this may affect the value of the Pier for the purposes of evaluating whether it is in the best interest of the estate to reject the oral contract for sale, and vice versa.[17]

Although § 365(i) is inapplicable, if the Bankruptcy Court approves the rejection by Nickels of either the Lease or the oral contract for sale, it should consider whether other statutory

---

petition breach of a contract does not render the contract non-executory. *In re W & L Assocs., Inc.*, 71 B.R. 962, 965 (Bankr. E.D. Pa. 1987).

[17]We need not address two issues raised in Wild Waves' cross-appeal, namely, that the Bankruptcy Court erred in relying on the two letter offers in determining the value of the Pier and in holding that an increase in property value alone is sufficient to satisfy the business judgment rule, in light of today's ruling. To the extent that the valuation of the Pier will be relevant to the Bankruptcy Court's analysis on remand, this Court is concerned that the evidence admitted in the prior proceedings may not be enough to determine the property's value. Ordinarily, property values will be determined with the aid of expert evaluation or, at minimum, firm offers to purchase the property. *See In re Central Jersey Airport Svcs.*, 282 B.R. at 183 (business judgment standard met for rejection of contract for sale where appraisal of debtor's property indicated that value had appreciated by $2 million).

provisions, such as § 365(h), offer protection to Wild Waves.[18]

## IV.

For the reasons set forth above, this Court will reverse the Bankruptcy Court's order of September 14, 2005, determining that Wild Waves was entitled to the protections set forth in § 365(i), and remand the matter for further proceedings consistent with this Opinion.  The Court will deny Wild Waves' cross-appeal.  The Court will enter an appropriate order.


Dated: April 24, 2006



s/ *Joseph E. Irenas*
JOSEPH E. IRENAS, S.U.S.D.J.

---

[18]The Bankruptcy Court observed that if Wild Waves was not in possession of the property under the contract for sale, § 365(j) may be applicable.  Judge Burns correctly noted that this section would entitle Wild Waves only to a lien in the amount of any payments it had made toward the purchase price.  Given that Wild Waves has made no payments toward the purchase price of the Pier, this section would offer it no relief. *See In re Waldron*, 36 B.R. 633, 641 (Bankr. S.D. Fla. 1984).